# No. 09-70017

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

IVAN CANTU,

Petitioner-Appellant,

v.

RICK THALER, Director, Texas Department of
Criminal Justice, Correctional Institutions Division,
Respondent-Appellee.

_____

On Appeal from the United States District Court
for the Eastern District of Texas, Marshall Division

_____

## BRIEF OF RESPONDENT-APPELLEE

_____

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
For Criminal Justice

*Counsel of Record

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division

*THOMAS M.  JONES
Assistant Attorney General
Postconviction Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400

_____

ATTORNEYS FOR RESPONDENT-APPELLEE

## STATEMENT REGARDING ORAL ARGUMENT

The issues under consideration are addressed in the written briefs.

Unless the Court holds otherwise, oral argument would not aid the Court

in its consideration.  See Fed. R. App. P. 28.2.4.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    Facts related to the offense . . . . . . . . . . . . . . . . . . . . 3

        B.    Facts relating to punishment . . . . . . . . . . . . . . . . . 4

    II.    State Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    III.    State Habeas Proceedings . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    Defense psychologist's affidavit . . . . . . . . . . . . . . . 8

        B.    Affidavits of defense counsel . . . . . . . . . . . . . . . . . 11

            1.    J. Matthew Goeller . . . . . . . . . . . . . . . . . . . . . 11

            2.    Don High . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C.    State court findings and conclusions . . . . . . . . . . . 18

    IV.    Proceedings In The Court Below . . . . . . . . . . . . . . . . . . 20

TABLE OF CONTENTS, con't.

Page

A.  Ineffective assistance, mitigation  . . . . . . . . . . . . . . 20

B.  Ineffective assistance, innocence  . . . . . . . . . . . . . . 21

STANDARD OF REVIEW  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.  In The Court Below  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.  In This Court  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.  Counsel's Sentencing Strategy Was Reasonable And Did
    Not Have To Be Based Upon Evidence of Bipolar
    Disorder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.  As For The Claim That Counsel Was Ineffective For
     Failing To Base The Defense Upon Innocence, Cantu Is
     Entitled To No Relief.  . . . . . . . . . . . . . . . . . . . . . . . . . 32

    A.  Because Cantu did not raise the claim in
        state court and because he cannot do so now,
        the claim is defaulted.  . . . . . . . . . . . . . . . . . . . . . 32

    B.  Ineffective assistance of state habeas counsel
        cannot constitute cause sufficient to excuse
        a state-law default. . . . . . . . . . . . . . . . . . . . . . . . 41

    C.  In the alternative, Cantu does not show that the
        only reasonable defense was innocence-based.  . . . . 42

    D.  The court below did not abuse its discretion when
        it failed to stay and abate proceedings.  . . . . . . . . . 47

TABLE OF CONTENTS, con't.

Page

      1.   Cantu showed no good cause. . . . . . . . . . . . . 48

      2.   The claim sought to be advanced was
          meritless. . . . . . . . . . . . . . . . . . . . . . . . . . . 50

III.   Even If A Bare Innocence Claim Were Cognizable,
     Cantu's Evidence Does Not Meet The Standard. . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

Cases                                                                        Page

Brewer v. Johnson, 139 F.3d 491 (5th Cir. 1998) . . . . . . . . . . . . . 47, 50

Ex parte Brooks, 219 S.W.3d 396 (Tex. Crim. App. 2007) . . . 35, 39, 40

Buchanan v. Kentucky, 483 U.S. 402 (1987) . . . . . . . . . . . . . . . . . . . 31

Callins v. Johnson, 89 F.3d 210 (5th Cir. 1996) . . . . . . . . . . . . . 41, 42

Clements v. Maloney, 485 F.3d 158 (1st Cir. 2007) . . . . . . . . . . . . . 48

Coleman v. Thompson, 501 U.S. 722 (1991) . . . . . . . . . . . . . 33, 40, 42

Finley v. Johnson, 243 F.3d 215 (5th Cir. 2001) . . . . . . . . . . . . . 33, 40

Florida v. Nixon, 543 U.S. 175 (2004) . . . . . . . . . . . . . . . . . . . . . . . 46

Foster v. Quarterman, 466 F.3d 359 (5th Cir. 2006) . . . . . . . . . . . . . 22

Garland v. Maggio, 717 F.2d 199 (5th Cir. 1983) . . . . . . . . . . . . . . . 25

Green v. Johnson, 116 F.3d 1115 (5th Cir. 1997) . . . . . . . . . . . . . . . 28

Haynes v. Cain, 298 F.3d 375 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . 46

Herrera v. Collins, 506 U.S. 390 (1993) . . . . . . . . . . . . . . . . . . . . . . 51

Hooks v. Roberts, 480 F.2d 1196 (5th Cir. 1973) . . . . . . . . . . . . . . . 50

Jackson v. Johnson, 150 F.3d 520 (5th Cir. 1998) . . . . . . . . . . . . . . . 24

Jones v. Barnes, 463 U.S. 745 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 49

Josselyn v. Dennehy, 475 F.3d 1 (1st Cir. 2007) . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES, con't.

Cases                                                              Page

King v. Dretke, No. 1:01CV4335, 2006 WL 887488
    (E.D. Tex. Mar. 29, 2006) (unpublished) . . . . . . . . . . . . . . . . . . 34

In re Kirkland, 86 F.3d 172 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . 48

Lagrone v. State, 942 S.W.2d 602 (Tex. Crim. App. 1997) . . . 12, 28, 31

Lewis v. Dretke, 355 F.3d 364 (5th Cir. 2003) . . . . . . . . . . . . . . 27, 28

Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000) . . . . . . . . . . . 39, 45

Martin v. Maggio, 711 F.2d 1273 (5th Cir. 1983) . . . . . . . . . . . . . . . 26

Martinez v. Johnson, 255 F.3d 299 (5th Cir. 2001) . . . . . . . . . . Passim

McFarland v. Scott, 512 U.S. 849 (1994) . . . . . . . . . . . . . . . . . . 47, 50

Montoya v. Johnson, 226 F.3d 399 (5th Cir. 2000) . . . . . . . . . . . . . . 23

Neal v. Puckett, 286 F.3d 230 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . 24

Nobles v. Johnson, 127 F.3d 409 (5th Cir. 1997) . . . . . . . . . . . . . . . . 26

Pace v. DiGuglielmo, 544 U.S. 408 (2005) . . . . . . . . . . . . . . . . . . . . 48

Pennsylvania v. Finley, 481 U.S. 551 (1987) . . . . . . . . . . . . . . . . . . . 42

Ex parte Reed, 271 S.W.3d 698 (Tex. Crim. App. 2008) . . . . . . . . 36, 39

Rhines v. Weber, 544 U.S. 269 (2005) . . . . . . . . . . . . . . . . . . 47, 48, 50

Richards v. Quarterman, 566 F.3d 553 (5th Cir. 2009) . . . . . . . . . . . 43

# TABLE OF AUTHORITIES, con't.

Cases                                                                    Page

Ruiz v. Quarterman, 460 F.3d 638 (5th Cir. 2006) . . . . . . . . . . . . . . . 41

Schlup v. Delo, 513 U.S. 298 (1995) . . . . . . . . . . . . . . . . . . 35, 36, 40, 51

Sonnier v. Quarterman, 476 F.3d 349 (5th Cir. 2007) . . . . . . . . . 26, 30

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . . . . . . . . Passim

Townsel v. Contra Costa County, Cal., 820 F.2d 319
     (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

United States v. Short, 181 F.3d 620 (5th Cir. 1999) . . . . . . . . . . . . 46

Ward v. State, No. AP-74,695, 2007 WL 1492080
     (Tex. Crim. App. May 23, 2007) (unpublished) . . . . . . . . . . . . . 31

Wiggins v. Smith, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . Passim

Williams v. Collins, 16 F.3d 626 (5th Cir. 1994) . . . . . . . . . . . . . 27, 28

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . 23

Woodward v. Epps, No. 06-70053, 2009 WL 2569795
     (5th Cir. Aug. 21, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Wooten v. Kirkland, 540 F.3d 1019 (9th Cir. 2008) . . . . . . . . . . . . . 48


Statutes and Rules

28 U.S.C. § 2254 (West 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

Fed. R. App. P. 28.2.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

# TABLE OF AUTHORITIES, con't.

Page

Fed. R. App. P. 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Tex. Code Crim. Proc. art. 11.07 (West 2009) . . . . . . . . . . . . . . . . . . . 35

Tex. Code Crim. Proc. art. 11.071 (West 2009) . . . . . . . . . 21, 34, 35, 40

Tex. Code Crim. Proc. art. 37.071 (West 2009) . . . . . . . . . . . . . . . . . . 2

Tex. Code Crim. Proc. art. 44.251 (West 2009) . . . . . . . . . . . . . . . . . . 2

# STATEMENT OF THE ISSUES

At issue are the following:

I.    Cantu did not wish to advance a mental-health-related defense at sentencing, and such a defense may have opened him up to an accusation of sociopathy. Further, counsel has a reasonable defense based up the defendant's good work history, childhood difficulties, and a religious conversion. Was counsel ineffective for failing to advance the mental-health-based defense? (Order Granting Request to Proceed in Forma Pauperis on Appeal and Issuing COA (COA Order) at 2; Docket # 37 at 2; 9 RE[1] 2; R[2] 267);

II.   Cantu confessed his guilt to his girlfriend and to his counsel; his prints were found on the murder weapon; he was seen driving the car of one of the victims, and his girlfriend was seen wearing the ring of another. Was counsel ineffective at guilt-innocence for failing to investigate Cantu's innocence? (COA Order at 3; Docket # 37 at 3; 9 RE 3; R 268); and

III.  Cantu confessed his guilt to his girlfriend and to his counsel; his prints were found on the murder weapon; he was seen driving the car of one of the victims, and his girlfriend was wearing the ring of another. Does he offer a convincing case of innocence? (COA Order at 4; Docket # 37 at 4; 9 RE 4; R 269).

---

[1]  "RE" refers to the record excerpts filed with Cantu's brief, preceded by the tab number and followed by the page number.

[2]  "R" refers to this Court's appellate record, followed by the page number.

## STATEMENT OF THE CASE

Cantu was convicted and sentenced to death in the murders of his cousin James Mosqueda and Mosqueda's fiancee, Amy Kitchens. (8 CR[3] 1434–35.) The Court of Criminal Appeals affirmed the conviction and sentence, Cantu v. State, No. 74,220, 2004 WL 3093156 (June 30, 2004) (unpublished), and Cantu sought no certiorari review. The state court denied his application for habeas corpus relief, Ex parte Cantu, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (unpublished), as did the court below, Cantu v. Quarterman, No. 2:06cv166, 2009 WL 728577 (E.D. Tex. March 17, 2009) (unpublished) (Docket # 31; 6 RE; R 257). The court below granted COA on the three issues listed above.[4] (COA Order; Docket # 37; 9 RE; R 266–69.)

---

[3] "CR" refers to the clerk's record of papers filed in the trial court followed by the page number.

[4] The court below also granted COA on a claim involving articles 37.071 and 44.251 of the Code of Criminal Procedure. (COA Order at 3; Docket # 37 at 3; 9 RE 3; R 268.) Cantu does not advance this claim before this Court. (Br. at 2 n.2).

STATEMENT OF FACTS

I.    Trial

A.    Facts related to the offense

The facts of the offense are taken from the original opinion of the

Court of Criminal Appeals:

> [Cantu] and [Amy] Boettcher shared an apartment not far
> from the victims, James Mosqueda and Amy Kitchens.
> Mosqueda was [Cantu's] cousin.  On the night of the offense,
> [Cantu] told Boettcher he was going to Mosqueda and
> Kitchens' house to kill them, but Boettcher did not believe him.
> [Cantu] spoke with Mosqueda on the phone before leaving at
> about 11:30 p.m. While [Cantu] was gone, Boettcher talked on
> the phone with her stepfather, whom she and [Cantu] were
> going to visit in Arkansas the next day.  When [Cantu]
> returned around 12:20 a.m., his face was swollen and he had
> what looked like blood on his jeans and in his hair.  He told
> Boettcher that "it wasn't pretty" and began unloading his gun,
> complaining that it had jammed on him.  He had the victims'
> identification and car keys.  Boettcher testified that she threw
> [Cantu's] bloody jeans in the kitchen trash can.  After he
> cleaned up, [Cantu] made Boettcher return with him to the
> victims' house to see what he had done.  They drove Kitchens'
> Mercedes.  Boettcher testified that she could see the victims'
> bodies through the doorway to the master bedroom.  They
> parked the Mercedes in the garage and left in Mosqueda's
> Corvette.  [Cantu] gave Boettcher a diamond engagement ring
> that had belonged to Kitchens.  Boettcher did not attempt to
> elude [Cantu] or turn him in after learning of the murders.
> She testified that she was terrified of [Cantu] and thought he
> might kill her. [Cantu] had shot at Boettcher with a pistol the
> night before the murders and slammed the door on her hand
> as she tried to leave.

Cantu v. State, 2004 WL 3093156, at *1.

B.    Facts relating to punishment

Before this murder, Cantu had been convicted of theft, driving while intoxicated, evading arrest, and felony possession of cocaine. (2 RR[5] 10, 22, 205–21.) During one arrest, he endangered pedestrians by driving his car through a nightclub parking lot recklessly. (2 RR 11–12, 18.) He had defied his probation officer, tested positive for drugs, and had his probation revoked. (42 RR 91–94, 160–61.) During his drunken-driving arrest, he was clocked going twice the speed limit and led police on a chase through a residential area. (42 RR 25–59.)

Cantu's first wife, Michelle Traister, testified that her husband beat her, punched her in the face, butted her with his head, slammed her head onto a concrete surface, and threatened her life while he choked her. (43 RR 110–11, 114–16.) She said that throughout their marriage, she and Cantu used drugs. (43 RR 151–57, 186–87.)

In summer 1999, after the dissolution of his marriage, Cantu enlisted in the Navy but did not complete basic training, going absent

---

[5]  "RR" refers to the reporter's record of the trial testimony, preceded by the volume number and followed by the page number.

without leave and receiving a less-than-honorable discharge. (43 RR 96–97.)

Later that year, he remarried, this time to a woman he met in a strip club. (42 RR 53.) His second wife, Jennifer, more than once called the police for domestic disturbances. (42 RR 129, 140–41, 157.) Each time police arrived, although Cantu was not at home, his wife bore bruises. (42 RR 130–31, 134–36, 142–44, 146–48, 151–53, 158–64, 175–77.) Michelle Gonzales, a friend of Cantu's wife, also saw the bruises and told her friend to leave her husband. (42 RR 62–66.) Jennifer left Cantu in early 2000. (42 RR 66.)

After a disturbance at a restaurant in January 2000, Cantu was again arrested for public intoxication. (42 RR 40–47.) And in an unrelated incident, he offered to help an acquaintance resolve a dispute by having the acquaintance's rival "knocked off." (43 RR 33–34.)

About this time, Cantu's mother had her son detained for mental evaluation because she thought he was suicidal. (42 RR 180–92.) Cantu's confrontations with his mother through fall 2000 at times required that others intervene to ensure her safety. (43 RR 4–14, 54–63.)

To counter the State's case, the defense showed that Cantu had been a good child but that his father had been absent from the home for long periods. (44 RR 23–35, 174–78; 45 RR 7–8.) After Cantu's father and mother divorced, his mother held a number of jobs while she and her son moved often. (44 RR 20–22.) His father did not pay child support regularly, and money was tight. (44 RR 30.)

Cantu was a good student and was industrious, lying about his age to get his first job at a fast-food restaurant at fourteen. (44 RR 36.)

After leaving high school, Cantu was employed in several legitimate businesses. (44 RR 38–45.) But after financial setbacks, he began having problems with his temper and started abusing drugs and alcohol. (44 RR 46–49.) His mother said that after his first divorce, her son became disoriented, depressed, unfocused, and withdrawn. (44 RR 51.) Depression ran in the family, she said. (44 RR 111.)

His mother said that after her son's arrest and while he was in Collin County jail, he converted to Christianity (44 RR 103) and took Bible courses by mail (44 RR 105–06). He drew no disciplinary actions. (44 RR 561–62.)

Testifying for Cantu were two psychologists and a minister. One of the psychologists, Dr. Mark Cunningham, said that studies suggest capital murderers sentenced to life in prison do not pose a danger to other inmates or to prison personnel. (45 RR 52–87, 89–122, 123–210.) The other psychologist, Dr. Walter Quijano, testified about the prison classification system. (46 RR 154–90, 199–208, 211–12, 218–20, 221–22.) He said that an incoming prisoner is evaluated on his physical and mental health, education, employment abilities, and security risk. (46 RR 158–63.) The minister, Maury Davis from Tennessee, had served time in Texas for murder. (46 RR 91, 95, 103–04.) He spoke of his spiritual conversion and redemption. (46 RR 96–108, 117–18, 125–28, 129–36.)

## II.    State Appeal

As mentioned above, after the jurors found Cantu guilty and after the trial court assessed the death penalty, the conviction and sentence were affirmed on appeal. See Cantu, 2004 WL 3093156, at *5.

III.   State Habeas Proceedings

In state habeas proceedings, Cantu alleged that he received ineffective assistance at sentencing when counsel did not investigate and offer evidence about his mental health.  (SHCR[6] 14–25.)

A.    Defense psychologist's affidavit

Dr. Daneen Milam, a psychologist, testified through an affidavit. (Id. at 97–103.)  She said Cantu had mood swings, grandiose thought patterns, violent nightmares, difficulties working through logical problems, and showed errors in comprehension.  (Id. at 99, para. 6.)  For example, she said, Cantu left school, had walked off jobs, was discharged from basic training, and was unable to learn from failed relationships. (Id.) She said Cantu's patterns of behavior are commonly seen in a bipolar diagnosis.  (Id.)

Cantu's records, suicidal gestures, grandiose thinking, poor insight, and substance abuse show a pattern of manic highs and depressive lows, she said.  (Id., para. 7.)  When he used a stimulant, he became abusive in personal relationships.  (Id.)  She said that bipolar individuals respond to

---

[6] "SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court.

stimulants with defiance, moodiness, and may become violent. (Id.) She said his behavior "strongly suggest symptoms suggestive" of bipolar disorder. (Id. at 100, para. 7.) Had Cantu been evaluated before sentencing, she said, a mental-health professional would have recognized that he needed a neuropsychological evaluation to rule out an organic cause for his behavior. (Id.)

Dr. Milam interviewed Cantu on death row for about ten hours. (Id. at 100, para. 9.) She tested him with portions of the Halstead-Reitan Neuropsychological Battery for Adults and other psychological and neuropsychological tests. (Id.)

During the tests, she said, Cantu showed pressured speech, an exaggerated sense of self-confidence, and tended to place himself in leadership positions in his jobs. (Id. at 100–01, para. 10.) Overall, she said, he was impulsive, planned poorly, was distracted easily, was mentally inflexible, and had poor but fast motor skills. (Id. at 101, para. 10.) He showed "constructional dyspraxia," with an error-pattern consistent with "a regulating difficulty rather than an organic dysfunction." (Id.) Milam said that Cantu had difficulty with "measures of central nervous system integrity; attentional deficits, impulsivity,

organizational deficits, constructional dyspraxia, along with partial loss of the ability to inhibit responses." (Id.) The overall results, she said, showed a "consistent pattern of poor regulation of thoughts, feelings and abilities." (Id.) Such a pattern, she said, is "consistent with a diagnosis of Bi-Polar disorder." (Id.)

Bipolar disorder does not result from "lack of will power, oppositional or defiant behavior or poor parenting," she said, although poor parenting will "worsen [its] course." (Id., para. 11.) The effects of Cantu's disorder, she said, were "no doubt aggravated" by his early home life, which was marked by poverty, alcoholism, drug abuse, physical abuse, neglect, mental illness, and the deaths of more than one family member. (Id.)

On August 29, 2000, some sixty-five days before the murder, Milam said, Cantu was taken to Parkland Hospital for "suicidal gestures." (Id. at 102, para. 12.) He was released the same day, and "an opportunity to remediate his Bi-Polar disorder was missed." (Id.) By the Labor Day weekend, she said, Cantu had moved into a manic phase and met Amy Boettcher. (Id.) He began to abuse drugs, specifically, crank, ecstacy, and speed, Milam said. "These drugs interact with a Bi-Polar disorder to

cause difficult and unpredictable behavior, irritability, agitation, and cause biological and chemical malfunctions to escalate," she said. (Id.)

As "self-medication escalates," Dr. Milam said, "the roller coaster ride of ups and downs" alienates people capable of supporting the individual. (Id.) "People with Bi-Polar disorder rarely realize how impaired they are and blame others for their problems, isolating them even more." (Id.)

During the interview, she said, Cantu denied committing the offense. (Id., para. 13.)

"Cantu did not choose to be born into a dysfunctional family," she said. "He did not choose to develop a Bi-Polar disorder." (Id. at 103, para. 14.) She suggested that Cantu's drug abuse was an attempt at self-medication. (Id.)

B.     Affidavits of defense counsel

1.     J. Matthew Goeller

Cantu's trial counsel, J. Matthew Goeller testified by affidavit. (Id. at 151–63.) He said that throughout his dealings with Cantu, his client could discuss the allegations against him intelligently. (Id. at 158.) Cantu remembered his involvement with the victims and the trial witnesses and

could aid in his own defense. (Id.) He paid attention and proposed questions for witnesses, questions that were generally relevant and helpful. (Id.)

Goeller said that from the start of representation, he, mitigation specialist Vince Gonzales, and co-counsel Don High discussed having Cantu examined by a psychologist. (Id.) They knew that under state law, where the defense introduces or plans to introduce expert testimony on future dangerousness, the court may order the defendant to submit to a state-sponsored psychiatric exam. (Id., citing Lagrone v. State, 942 S.W.2d 602 (Tex. Crim. App. 1997).)

They were worried about subjecting Cantu to the State's exam. (SHCR 158.) Cantu was manipulative, Goeller said, and had on several occasions lied to counsel. (Id.) Goeller said that Cantu had at various times told counsel (1) he had nothing to do with the murders; (2) his friends and the real killer, a pizza delivery man, had conspired against him; (3) he, Cantu, had indeed killed Mosqueda for ripping him off on a drug deal and had killed Kitchens to eliminate a witness; (4) and he wanted to advance an insanity defense involving a conspiracy among Mosqueda, Kitchen, and Boettcher to brain-wash him with the drug

Rohypnol and that the drug caused him to commit the murders. (Id. at 158–59.) When told that counsel could not advance perjury, Cantu said, " 'Your (counsel's) job is to get me home, period.' " (Id. at 159.) Counsel feared that a State exam would lead to a finding of manipulation, a finding that would be used against Cantu. (Id.)

Goeller said that counsel decided not to have Cantu evaluated because, first, Cantu did not wish to offer a defense based on mental health, and second, counsel did not believe that the report would be helpful. (Id.) Goeller said that Cantu told counsel that he had killed Mosqueda and Kitchen because after Cantu had supplied Mosqueda with 2.5 kilograms of cocaine, which Mosqueda had sold for several thousand dollars, Mosqueda had not paid Cantu for the drugs. (Id.) Third, Goeller said, counsel feared that given Cantu's history of violence toward women and the gruesome nature of the murders, a state-sponsored psychiatrist would pronounce Cantu a sociopath. (Id.)

And, Goeller said, they had no evidence that Cantu suffered from a mental-deficiency, particularly bipolar disorder. (Id. at 160.) Goeller said that in his seventeen years of practice, he had represented clients with bipolar disorder and that he was familiar with the symptoms. (Id. at 160.)

Cantu, he said, showed none. (Id.) Nothing in his client's mental-health records suggested that Cantu suffered from bipolar disorder. (Id.) Counsel interviewed Cantu and Cantu's family members and no one mentioned a bipolar or schizophrenic disorder. (Id.) His client's moods did not swing and his personality did not change. (Id.) The social history showed that he was a good student and was a successful mortgage broker. (Id. at 160–61.)

Noting that Cantu was charged with killing two people at home in their bed, Goeller said that counsel determined that the best chance for a life sentence lay not with a mental-defect mitigation case, which likely would lead to evidence of sociopathy. (Id. at 159.) Cantu's best chance for a life sentence, Goeller said, lay with a mitigation case based upon his positive history, for example, his being a good student and successful mortgage broker. (Id. at 160.)

### 2.    Don High

Don High, defense co-counsel, said that counsel determined that the best sentencing strategy involved four points: (1) Cantu's dysfunctional childhood and family, (2) his abuse of and addiction to alcohol and drugs,

(3) his future peaceableness in a controlled prison setting without drugs or alcohol, and (4) his spiritual conversion. (Id. at 169.)

Counsel knew, High said, that the State would introduce evidence of other crimes and bad acts, including, a successfully completed deferred adjudication probation for felony cocaine possession; misdemeanor convictions for driving while intoxicated, evading arrest, and reckless driving; other extraneous offenses, such as issuing a bad check, selling drugs, abusing drugs, public intoxication, failing to maintain insurance, criminal mischief, theft, assault, and possessing an unlawful concealed weapon. (Id.)

During jury selection, High said, counsel sought jurors who would examine punishment-phase issues and who would consider Cantu no danger so long as he was imprisoned. (Id. at 169–70.)

The mitigation specialist, Vince Gonzales, talked to Cantu's mother, Sylvia; his father, Abner; his brother, Erik; two aunts, Penny Leland and Imelda Martinez; and a friend, Jay Swann. (Id. at 170–71.) Counsel said they knew of Cantu's childhood difficulties: his parents' divorce and his being raised by a single parent where money was tight and moves frequent. (Id. at 171.) Cantu was often disappointed by his absent father,

an alcoholic and drug addict. (Id.) And Cantu's early life was marked by family deaths, a cousin, when Cantu was in junior high, and an uncle who committed suicide in the family home. (Id., 45 RR 9–11) Counsel thought that the mitigating evidence offered by Cantu's childhood difficulties was limited. (SHCR 171.) Counsel considered more helpful Cantu's drug and alcohol abuse, his peaceable behavior in jail, and his business success. (Id.)

The defense did employ a psychologist, Dr. Cunningham to evaluate and testify about Cantu's future dangerousness. (Id. at 172.) The sentencing strategy was based upon Cantu's good behavior in a drug- and alcohol-free setting, such as prison. (Id. at 172.) High said that Cunningham testified that Cantu had not been violent in Collin County jail, had a history of employment since the age of fourteen, had a Graduate Equivalency Diploma, was resourceful, intelligent, and had undergone a Christian conversion. (Id.)

High said that counsel did not ask Cunningham to assess Cantu for bipolar disorder or retardation. (Id. at 173.) Based on their observations, counsel did not suspect a mental defect. (Id.) And Cunningham did tell

counsel that Cantu might be depressed and that he might also be a sociopath. (Id.)

High said that in his fifteen years as an attorney, he had many clients with bipolar disorder, that he knew the disorder's affects and symptoms, and that Cantu showed none. (Id. at 175.)

In evaluating Cantu, counsel reviewed his childhood and adolescent school records, childhood and adolescent awards and certificates, letters and correspondence to friends and family, details of prior offenses, employee awards, tax returns and records, employment records, jail records, jail medical records, jail intake screening records, jail grievance and reply forms, Correctional Medical Services Mental Health Evaluation, Screening, and Assessment, Parkland Hospital Medical records (including the medical and psychiatric evaluations performed on August 29–30, 2000), and letters of commendation from the Christian Bible Institute. (Id. at 176.)

High said that defense counsel, as had Dr. Milam, reviewed the records from Parkland Hospital. (Id.) But the defense attorneys, after talking to witnesses and discussing the matter between themselves, concluded that Cantu did not have bipolar or other psychiatric disorder.

-17-

(Id.)  First, High said, the Parkland doctors did not diagnose or indicate any disorder.  (Id.)  Second, he said, no family members suggested that Cantu's mental capacity was diminished or mentioned bipolar disorder or schizophrenia with respect to either Cantu or themselves.  (Id. at 176–77.)

High echoed Goeller's response, saying that the defense wanted to avoid a mental-health defense because of the danger that Cantu would be pronounced a sociopath.  (Id. at 177.)

## C.    State court findings and conclusions

Sitting as the habeas court, the trial court found that Dr. Milam, a psychologist, was not competent to make a diagnosis of organic brain damage or to conclude that the trial counsel was ineffective.  (Id. at 187–88, Finding of Fact (FoF) 5.)  The court said that Dr. Milam's limited review of the record and her overreliance upon Cantu as her source led to factual errors in her affidavit.  (Id. at 188, FoF 6.)  For example, the court said, contrary to her assertions, the trial record contained evidence of Cantu's childhood difficulties, his substance abuse, and cycles of

depression.[7] (Id.) The errors[8] reduced her credibility, the court said. (Id., FoF 7.) Trial counsel, Goeller and High, both board certified in criminal law, were capable and competent. (Id., FoF 8.) Their explanations about their preparation and strategy were consistent and credible. (Id., FoF 9.) Based upon their investigation of Cantu's history and background and their interaction with their client, counsel did not believe that a defense based upon a mental disorder was warranted. (Id., FoF 10.) Neither did counsel believe that such evidence, if available, would comport with a viable trial strategy. (Id.) Cantu did not want to advance a defense based upon mental health. (Id., FoF 11. ) Instead, the defense emphasized Cantu's religious conversion and his ability, with self-control and discipline, to change. (Id.) Defenses combining mental-health and his ability to change would not have been wholly consistent. Id. Counsel's performance was zealous and competent, their strategy reasonable, and their representation not deficient. (Id.) The Court of Criminal Appeals

---

[7] Jail records showed that Cantu received Elavil, an antidepressant. (51 RR (Medication Administration Record).)

[8] Another error by Dr. Milan was not noted by the state court. She cited as an example of Cantu's manic behavior his hasty marriage to Boettcher. (SHCR 102, para. 11.) The record does not show that Cantu and Boettcher ever married.

adopted the findings and denied relief.  Ex parte Cantu, No. WR-63,624-01, slip op. at 2 (Jan. 18, 2006) (unpublished).

IV.   Proceedings In The Court Below

A.   Ineffective assistance, mitigation

In the court below, Cantu alleged he received ineffective assistance when counsel at sentencing failed to investigate and present evidence of his mental health.  (Mem. of Law in Supp. of Movant's Pet. for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Mem.) at 12–17; Docket # 10 at 19–24; R 58–70.)

The court below determined that the decision of the state court was not contrary to Supreme Court precedent and was in light of that precedent reasonable. (Mem. Op. at 9; Docket # 30 at 9; 8 RE 9; R 243.) The court determined that counsel's decision not to investigate can be reasonable to the extent that "reasonable professional judgments support" that decision.  (Mem. Op. at 8; Docket # 30 at 8; 8 RE 8; R 242.)  The decision not to investigate must be assessed in each circumstance applying a "heavy measure of deference to counsel's judgments."  (Mem. Op. at 8, citing Wiggins v. Smith, 539 U.S. 510, 521–22 (2003); Docket # 30 at 8; 8 RE 8; R 242.) The court noted that counsel reasoned that if they based the

defense upon Cantu's mental health, under state law the prosecution would be able to examine Cantu and defense counsel feared that such an examination would harm the defense. (Mem. Op. 8; Docket # 30 at 8; 8 RE 8; R 242.) The court below determined that counsel's decision was reasonable. (Mem. Op. 8; Docket # 30 at 8; 8 RE 8; R 242.)

B.    Ineffective assistance, innocence

In the court below, Cantu alleged that counsel was ineffective for failing to investigate his claims of innocence. (Mem. at 38; Docket # 10 at 38; R 84.) The court below determined that because Cantu did not raise the claim in state court and because if he were to raise the claim now, the state court would reject the claim on procedural grounds, the claim was defaulted. (Mem. Op. at 18; Docket # 30 at 18; 8 RE 18; R 252.)

After the court below recited some of the evidence that Cantu alleged showed his innocence, to be discussed below in section II.A, the court determined that the evidence did not meet the state standard for merits review of a subsequent application. (Mem. Op. at 18; Docket # 30 at 18; 8 RE 18; R 252.) See Tex. Code Crim. Proc. art. 11.071, § 5(a)(2)(West 2009).

In the court below, Cantu alleged also that he is innocent of the crime. (Mem. at 50; Docket # 10 at 50; R 96.) The court below dismissed

the claim because it was not cognizable. (Mem. Op. at 21, citing Foster v. Quarterman, 466 F.3d 359, 367–78 (5th Cir. 2006); Docket # 30 at 21; 8 RE 21; R 255.)

After the court denied relief (Order and J; Docket # 31; 6 RE; R 257), it granted a COA on three issues, namely, whether counsel was ineffective for failing to investigate Canut's mental health and for not investigating his case for innocence and whether Cantu is entitled to relief because he is innocent. (Docket # 37; 9 RE; R 266–269.)

## STANDARD OF REVIEW

I.    In The Court Below

When a federal habeas petitioner challenges a state-court decision, the federal district court reviews that decision relying upon the federal habeas corpus standard of review. See 28 U.S.C. § 2254(d) (West 2009). Under that standard, where a claim was adjudicated on the merits in state court, the federal court may not grant relief unless the state court's adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. See § 2254(d)(1). The federal court also may grant relief if it found that the state court decision was

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See § 2254(d)(2).

The court cannot grant relief if it merely thinks that the state court decided the case wrongly.  Williams v. Taylor, 529 U.S. 362, 413 (2000).  The federal court may grant relief only if it determines that the state court decided the case differently than the United States Supreme Court has on a set of materially indistinguishable facts, see id., or if it determines that the state court decision is unreasonable, either factually or legally, Montoya v. Johnson, 226 F.3d 399, 404 (5th Cir. 2000).

An application of federal law that is unreasonable is different from one that is merely incorrect or erroneous.  See Williams v. Taylor, 529 U.S. at 412.  Under the "unreasonable application" clause, see § 2242(d)(1), a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.  See id. at 411.  An application is unreasonable if the state court identifies the correct governing legal principle from Supreme Court decisions but unreasonably applies the principle to the facts of the prisoner's case.  Id. at 413.

In making its determination, the federal court reviews not the state court's written opinion but its decision only.  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002). And when the federal court reviews the petition, the state court's factual findings are presumed to be correct.  28 U.S.C. § 2254(e)(1); Jackson v. Johnson, 150 F.3d 520, 524 (5th Cir. 1998).  To rebut that presumption, the petitioner must present evidence that is clear and convincing.  See § 2254(e)(1); Jackson, 150 F.3d at 524.

## II.    In This Court

This Court reviews findings of the court below for clear error and reviews issues of law de novo.  Martinez v. Johnson, 255 F.3d 229, 237 (5th Cir. 2001).

## ARGUMENT

## I.    Counsel's Sentencing Strategy Was Reasonable And Did Not Have To Be Based Upon Evidence Of Bipolar Disorder.

Cantu alleges that trial counsel was ineffective at sentencing for failing to discover and present evidence that Cantu suffers from bipolar disorder.  (Br. at 40–52.)

A petitioner who wishes to show ineffective assistance of counsel must show (1) that counsel's performance was deficient and (2) that the

deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The petitioner must show that counsel's representation fell below an objective standard of reasonableness. Id. at 687–88. A reviewing court must be "highly deferential" to counsel's conduct. Id. at 689. It must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 690. The petitioner must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy. See id. In fact, a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983).

"'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690–91.)

A reviewing court need not consider the deficiency prong if it concludes that the petitioner has shown no prejudice. Strickland, 466

U.S. at 697. The petitioner may not simply allege, but must "affirmatively prove" prejudice. Id. at 693. To assess prejudice during capital sentencing, the court "reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence." Wiggins, 539 U.S. at 534. To find prejudice, the court must find a reasonable probability that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Sonnier v. Quarterman, 476 F.3d 349, 356–57 (5th Cir. 2007) (citing Strickland, 466 U.S. at 695).

The burden of proof in a habeas corpus proceeding attacking the effectiveness of trial counsel is upon the petitioner. Martin v. Maggio, 711 F.2d 1273, 1279 (5th Cir. 1983). Because the issue of ineffective assistance is a mixed question of law and fact, see Strickland, 466 U.S. at 698, the court below reviewed the state court decision using the "unreasonable application" standard. See § 2254(d)(1); Nobles v. Johnson, 127 F.3d 409, 416 (5th Cir. 1997).

Both defense attorneys were knowledgeable about the symptoms of bipolar disorder and neither saw evidence that Cantu suffered from such a condition. (SHCR 160, 173.) Their review of Cantu's mental-health

records and their interviews with his family members did not turn up suggestions that he suffered from such a disorder. (Id. at 160, 176–77.) Nor did family members suggest that such a disorder ran in the family. (Id. at 176–77.) The defense psychologist, Dr. Cunningham, saw no evidence of bipolar disorder. (Id. at 173.) Counsel's failure to investigate the possibility of Cantu's having a bipolar disorder was reasonable. See Wiggins, 539 U.S. at 521; Strickland, 466 U.S. at 690–91.

To the extent that Cantu's claim comprises an argument that counsel was unreasonable to rely upon a strategy other than one based on mental health, Cantu fails to carry his burden. See id. 690.

Defense counsel's decision to forego a mental-health-based defense to avoid the State's rebuttal evidence can be reasonable. See Lewis v. Dretke, 355 F.3d 364, 366 (5th Cir. 2003) (determining that counsel's decision to forego psychiatric evaluation to avoid testimony from State's expert witness strategic, informed, and not deficient); Williams v. Collins, 16 F.3d 626, 634 (5th Cir. 1994) (noting that counsel made "knowing, strategic decision" to avoid psychiatric evaluation because counsel feared State would use rebuttal psychiatric testimony of client's future dangerousness). And counsel's decision not to offer an mental-health

defense can be conscious and informed.  See Green v. Johnson, 116 F.3d 1115, 1122–23 (5th Cir. 1997) (insanity defense).

As mentioned by the court below, under state law, where a defendant introduces or plans to introduce mental-health evidence in mitigation, the State is entitled to subject the defendant to a psychological exam from its own expert.  See Lagrone, 942 S.W.2d at 612.

Counsel's decision to avoid a sentencing strategy based upon mental health was sound.  Counsel were familiar with bipolar disorder and saw no sign of the condition.  (SHCR 160, 173.)  Cantu was manipulative and dishonest with counsel, at times denying involvement in the killings, at others acknowledging his guilt, and at times suggesting that Mosqueda, Kitchen, and Boettcher were brain washing him with Rohypnol.  (Id. at 158–59.)

Given such behavior on the part of Cantu, counsel were reasonable in avoiding a state-sponsored mental-health exam.  See  Lewis, 355 F.3d at 366; Williams, 16 F.3d at 634.

And counsel had a viable mitigation case based upon Cantu's dysfunctional childhood and family, his abuse of and addiction to alcohol

and drugs, his future peaceableness in a controlled prison setting without drugs or alcohol, and his religious conversion. (SHCR 169.)

Cantu does not show that counsel was required to investigate and present a bipolar-based defense. See Wiggins, 539 U.S. at 521. Counsel saw no evidence of bipolar condition, made a reasonable decision to avoid a State psychological exam, and had a viable mitigation defense available. Hence, when the state habeas court determined that Cantu had failed to show that counsel's performance was deficient, the state court's decision was reasonable, see § 2254(d)(1); Strickland, 466 U.S. at 687, and the court below was correct to so conclude, see Martinez, 255 F.3d at 237.

Were it assumed that counsel was deficient for not investigating the possibility of Cantu's having bipolar disorder, the evidence does not show that Cantu has the disorder. Dr. Milam did not diagnose Cantu with the disorder expressly. While she noted that when Cantu was released from Parkland Hospital, "an opportunity to remediate his Bi-Polar disorder was missed," she elsewhere said not that Cantu was bipolar but only that he "exhibited many of the symptoms" common with the disorder. (SHCR 99, para. 6.) Hence, even if counsel had Cantu tested, it is not clear that the mental-health expert would have diagnosed bipolar disorder.

And if it is assumed that an expert would have diagnosed the disorder, Cantu does not show that there is a reasonable probability that the result would have been different.  See Sonnier, 476 F.3d at 356–57.  The State may well have introduced evidence of sociopathy or at least of Cantu's manipulation and dishonesty.  (SHCR 173.)  The defense did, in fact, introduce evidence that Cantu would be peaceable in a controlled environment.  And that the evidence did not lead to a life sentence.  Thus, Cantu's argument that evidence of bipolar disorder would have avoided the death penalty is speculation only.  See Strickland, 466 U.S. at 693.

As for Cantu's reliance on the ABA Guidelines (Br. at 44), the guidelines are not rigid rules.  Id. at 688.

> [T]he existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Id. at 689.  Rigid adherence to a fixed set of rules would "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  Id. The

guidelines do not dictate the required actions of constitutionally effective counsel.

Cantu also argues that defense counsel misunderstood state law, that state law does not require that the prosecutor's mental-health expert be allowed to examine the defendant when the defendant offers mental-health evidence in general mitigation as opposed to future dangerousness. Cantu misreads state law.  In Lagrone, the Court of Criminal Appeals held the prosecution must be allowed to examine the defendant when the defendant offers mental-health evidence to show lack of future dangerousness.  942 S.W.2d at 611.  But the court, in an unpublished opinion, noted that the State's right to examine the defendant arose not from the nature of the evidence, that is, whether the evidence was offered to disprove future dangerousness or in general mitigation, but from the defendant's limited waiver of his privilege of silence.  See Ward v. State, No. AP-74,695, 2007 WL 1492080, at *6 (May 23, 2007).  That waiver would arise regardless of the purpose of the evidence.  Hence, even if the defendant offered mental-health evidence in general mitigation, he would waive his privilege of silence on the matter of general mitigation and the State's right to an examination would arise. See Buchanan v. Kentucky,

483 U.S. 402, 422–23 (1987) (noting that where defendant presents psychiatric evidence, prosecution may rebut with evidence from reports of the examination that defendant requested). The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

The state court identified the applicable Supreme Court precedent, Strickland 466 U.S. 668, and Wiggins, 539 U.S. 510, and applied that precedent reasonably. See §2254(d)(1). In reviewing the state court's decision, the court below did not err. See Martinez, 255 F.3d at 237.

II.  As For The Claim That Counsel Was Ineffective For Failing To Base The Defense Upon Innocence, Cantu Is Entitled To No Relief.

A.  Because Cantu did not raise the claim in state court and because he cannot do so now, the claim is defaulted.

Cantu alleges that counsel was ineffective for not advancing an innocence-based defense. (Br. at 20–37.) Cantu alleges that counsel should have investigated and advanced a defense based on the murders' having been committed by someone else, perhaps rival drug dealers. (Id. at 32–35.)

The court below rejected Cantu's claim on grounds that he never presented the claim to the state court and because were he to do so now,

the state court would reject the claim on procedural grounds. (Mem. Op. 18–19; Docket # 30 at 18–19; 8 RE 18–19; R 252–52.) Hence, the claim was defaulted. (Mem. Op. 19; Docket # 30 at 19; 8 RE 19; R 253.)

The court below did not err. See Martinez, 255 F.3d at 237. Where a petitioner has been through the state appellate and postconviction process, where he presents a claim to the federal court that was not presented to the state courts, the federal court recognizes that if the petitioner were to return to state court, the state court would dismiss the subsequent state application as abusive. See Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991); Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001). Hence, the claim, though not presented to state court, is nonetheless defaulted. See Coleman, 501 U.S. at 735 n.1; Finley, 243 F.3d at 220.

The rule applies here. Cantu has been through the state appellate and postconviction processes. (Cantu v. State, No. 74,220, 2004 WL 3093156 (Tex. Crim. App. June 30, 2004) (unpublished); Ex parte Cantu, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (unpublished).) In the state courts, he never raised this ineffective-assistance claim. (Br. for Appellant at 2–3, Cantu v. State, No. 74,220;

SHCR 5–89.) Were he to return to state court to present the claim, the court would dismiss the application as abusive. See Tex. Code Crim. Proc. art. 11.071, § 5. Thus, the claim is defaulted.

Cantu alleges that the claim is not defaulted because if he returns to state court, he has a remedy yet available, that the state court would review the claim on the merits. (Br. at 21–24.) He alleges that under state law a merits review or relief is available under a subsequent habeas application where that application contains specific facts establishing "by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt." (Id. at 23.) Article 11.071, § 5(a)(2).

First, to the extent that Cantu cites and relies upon an unpublished case out of the Eastern District of Texas, King v. Dretke, No. 1:01CV4335, 2006 WL 887488 (Mar. 29, 2006), the case, from a lower court and unpublished, does not control.

Second, King appears not to deal with the issue of procedural default but rather whether the federal court should stay the action to allow the petitioner to return to state court to present his claim.

Third, Cantu mischaracterizes the state rules regarding subsequent applications. The statute cited, Article 11.071, § 5(a)(2), is the state's codification of the innocence exception set out in Schlup v. Delo, 513 U.S. 298 (1995). See Ex parte Brooks, 219 S.W.3d 396, 399 (Tex. Crim. App. 2007). The exception allows a petitioner to obtain a merits review of an otherwise defaulted federal claim where he can show that had the error not occurred, more likely than not that no reasonable juror would have convicted him. See Schlup, 513 U.S. at 324; Ex parte Brooks, 219 S.W.3d at 399.

Under state law, to meet the innocence standard, the applicant must make a prima facie showing of innocence. See id. at 400 (construing article 11.07, § 4(a)(2), of the Code of Criminal Procedure, non-capital analog to statute here at issue). The statute allows a merits review of a claim where the applicant can show that a constitutional violation led to the conviction of an individual who is innocent of the offense. See id. at 401. "[T]o mount a credible claim of innocence, an applicant 'must support his allegations of constitutional error with reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " Ex parte

Reed, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008) (quoting Schlup, 513 U.S. at 324).

Cantu alleges the following evidence demonstrates his innocence:

• The records show that a long-distance phone call was placed from Cantu's apartment at 8:53 p.m. on November 4. (Br. at 33; SX[9] 119; 37 RR 57.) Thus, he argues, someone other than Cantu had access to his apartment after he and Boettcher had left for Arkansas. Hence, it may be inferred that he was framed by the true murderers, rival drug dealers. (Br at 33.)

• Toll-road records show that Mosqueda's Corvette was driven at 11:15 a.m. on November 4, after, according to Boettcher's testimony, she and Cantu had left for Arkansas. (Br. at 33; SX 117, 188; 37 RR 41–53; 36 RR 25.) Boettcher testified that she and Cantu had driven the Corvette at about 6:30 a.m. November 4, when they came back to Cantu's apartment from downtown Dallas. (35 RR 158–59.) She mentioned no later excursion in the Corvette. Cantu argues that the testimony suggests that someone other than he or Boettcher had driven the car before it was

---

[9] "SX" refers to the numbered exhibits offered and admitted into evidence at trial by the State.

discovered November 5 in the parking lot of his apartment complex. (Br. at 33–34.) Cantu notes also that when police conducted an emergency search of his apartment the evening of November 4, they did not see the Corvette. (Br. at 34 n.5.) Trial testimony indicated that when the car was discovered the next day, it was found close to Cantu's apartment. (Id.)

·  There were inconsistencies between the testimony of the medical examiner, Dr. William Rohr, and that of prosecution blood-spatter expert, Paulette Sutton. (Br. at 34.) Sutton said that based upon photos of the crime scene, Kitchen had been punched or kicked in the face and that the blow led to a blood spray pattern on the wall. (Id.; 37 RR 212–15.) But, Cantu argues, Dr. Rohr testified only that he saw gunshot wounds and a small contusion on Mosqueda's right should. Dr. Rohr did not mention any blow to Kitchen's face. (Br. at 34; SX 157, 158, 159, 160.) Cantu argues that counsel should have probed these inconsistencies in crossexamination. (Br. at 34.)

Cantu alleges also that counsel, rejecting an innocence-based defense, performed deficiently by not—

·  Interviewing Tawny Svihovic, Cantu's former girlfriend, at whose apartment police found the murder weapon. (Br. at 35.)

• Questioning prosecution witnesses about whether Cantu's face was swollen when they saw him in the early morning hours of November 4. (Id.) Boettcher had so testified and if other witnesses contradicted her testimony, her credibility would have been damaged. (Id.)

• Questioning prosecution witnesses who testified that they saw Boettcher wearing Kitchen's engagement ring about whether they also saw injury or swelling to the hand, which Boettcher and other witnesses said was the result of an assault by Cantu the night before. (Id.)

The evidence cited by Cantu does not demonstrate his innocence. As for the phone call from Cantu's apartment, the record shows that when the call was made, 8:37 p.m. November 4, the police were in the apartment. (32 RR 84.) An officer testified that Cantu's mother placed a call using the phone at about that time. (32 RR 84.)

The toll-road records show at most that Mosqueda's Corvette was driven northbound on the President George Bush Tollway through the Main Lane Plaza Two at 11:15 a.m. November 4. (37 RR 46, 52.) Boettcher testified that she and Cantu left for Arkansas on that day about noon. (35 RR 158.) The Corvette was found at Cantu's apartment complex (33 RR 60), which was within blocks of the toll plaza (50 RR SX

118), as was Mosqueda's apartment (31 RR 73). Cantu could have driven the Corvette through the plaza at that time on that date.

As for the purported inconsistency between the testimony of Dr. Rohn and that of Sutton, defense counsel noted that discrepancy to the jurors. (37 RR 227–28.) And Cantu does not suggest how the purported discrepancy suggests his innocence.

As for counsel's failure to interview Cantu's former girlfriend, Tawny Svihovec, to question prosecution witnesses as to whether Cantu's face was swollen, and to question prosecution witnesses as to whether Boettcher's hand was injured, Cantu does not describe the substance of the missing testimony. See Lockett v. Anderson, 230 F.3d 695, 713 (5th Cir. 2000) (noting that where defendant alleges counsel ineffective for failing to investigate, must allege what the investigation would have revealed). Cantu does not explain nor does he describe how this investigation or crossexamination would prove his innocence.

The evidence cited by Cantu does not exclude his guilt. See, e.g., Ex parte Reed, 271 S.W.3d at 751 (finding no prima facie case of actual innocence where petitioner advances incomplete theories of innocence and does not undermine evidence showing guilt); Ex parte Brooks, 219 S.W.3d

at 401 (finding that petitioner convicted of drug possession made no prima facie case of innocence where he argued he was innocence bystander and where police officer testified that he found drugs in motel room where petitioner sole occupant; construing article's non-capital analog).

Because the evidence cited does not show Cantu's innocence, were he to return to state court to present his claim, the state court would find that he does not meet the standard for a successive application under Article 11.071, § 5(a)(2), and would dismiss the application as abusive. Hence, the claim is defaulted.  See Coleman, 501 U.S. at 735 n.1; Finley, 243 F.3d at 220.

It should be noted though that because the statute in question, Article 11.071, § 5(a)(2), is meant to enshrine in state law the federal "innocence" exception set out in Schlup, see Ex parte Brooks, 219 S.W.3d at 399, if Cantu's evidence met the "innocence" standard, he could avoid any state-law default.  See 513 U.S. at 316.  Put another way, if Cantu's evidence of innocence meets the state standard for a successive application, see art. 11.071, § 5(a)(2), it also would meet the federal standard for avoiding a procedural default, see Schlup, 513 U.S. at 316. So if Cantu considers that he is wrongfully denied a merits review under

state law, he still can receive a merits review under federal law by showing that he is actually innocent of the crime charged. See id. But although Cantu seeks to avoid a state-law default through pleading cause and prejudice, see section II.B below, he does not seek to avoid the default by showing actual innocence. See id.

B. **Ineffective assistance of state habeas counsel cannot constitute cause sufficient to excuse a state-law default.**

Cantu alleges that even if the Court determines that he has no state remedy remaining, the default should be excused because of the failure of state habeas counsel to raise the claim. (Br. at 26.) Cantu acknowledges that this Court does not recognize a constitutional right to effective assistance of counsel in state habeas proceedings, see Ruiz v. Quarterman, 460 F.3d 638, 643–44 (2006); Martinez, 255 F.3d at 245, but raises the issue to preserve the matter for appeal.

The Director agrees that this Circuit had rejected the argument that the ineffective assistance of state habeas counsel can constitute cause sufficient to excuse a default. See Callins v. Johnson, 89 F.3d 210, 212–13 (5th Cir. 1996). As this Court has noted, "[C]ounsel's ineffectiveness will constitute cause only if it is an independent constitutional violation," id.

(quoting Coleman, 501 U.S. at 755), and there is no constitutional right to counsel in habeas proceedings, Callins, 89 F.3d at 212 (citing Pennsylvania v. Finley, 481 U.S. 551, 555 (1987)). Thus, no error by habeas counsel can constitute cause to excuse default. See Callins, 89 F.3d at 212.

C.   In the alternative, Cantu does not show that the only reasonable defense was innocence-based.

In the alternative, even if the ineffective-assistance claim is viewed on the merits, Cantu does not show himself entitled to relief. His claims seem to fall into two categories: (1) counsel's failure to investigate his innocence and (2) counsel's failure to fashion an innocence-based defense from the evidence already at hand.

As for counsel's failure to fashion an innocence-based defense, a reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 690.  The petitioner must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy.  See id.  Unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness, a

conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel. Richards v. Quarterman, 566 F.3d 553, 564 (5th Cir. 2009). Indeed, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. Strickland, 466 U.S. at 690.

As for the telephone records, the toll-road records, the testimonial inconsistencies, and the failure to cross-examine witnesses about Cantu's swollen face and Boettcher's hand, to the extent that the evidence was known and available to defense counsel, Cantu alleges that counsel was ineffective for failing to base his defense upon these matters. (Br. at 33–35.) Counsel testified that Cantu gave several different accounts, at times blaming others, at times acknowledging his own responsibility, and at times proposing an insanity defense. (SHCR 158–59.)

Counsel also faced evidence of Cantu's guilt. Boettcher gave statements to police reciting the details of the murders. (35 RR 80–206; 36 RR 6–8.) The murder weapon was found at the apartment of Cantu's former girlfriend. (32 RR 121–29, 162–69; 33 RR 108–10, 148–49.) The weapon bore his fingerprint and a bloodstain with Mosqueda's DNA. (32 RR 135–37, 182–93; 34 RR 147, 150; 37 RR 187–89.) Fragments of bullets

found in the victims' bodies had been fired through the gun. (37 RR 134–57.)

Mosqueda's Corvette was found in the parking lot of Cantu's complex near Cantu's apartment. (33 RR 59–62, 143–44; 34 RR 153–54.) A search of Cantu's apartment turned up the keys of Kitchen's Mercedes, bloodstained items, and ammunition of the same caliber used to kill the victims. (32 RR 25–33; 33 RR 90–95, 98–102, 144-47.)

The only evidence of the victims' being killed by rival drug dealers seems to have come from a telephone conversation between Cantu and a friend, Carlos Gonzales. With the permission of Gonzales, police monitored the call. In that conversation, which occurred on November 6, after the bodies had been found, Cantu told Gonzales that a drug dealer, dressed as a pizza delivery man, had come to his apartment and held a gun on him. (33 RR 65–66.) Cantu told Gonzales that the delivery man told him that Mosqueda had stolen from him, the pizza delivery man, in a drug deal. (33 RR 65–66, 70.) Cantu told his friend that the pizza delivery man said Mosqueda had promised the man that Cantu was going to help repay the money. (33 RR 70–71.) Cantu said that after the incident, he, Cantu, met with Mosqueda to discuss the matter. Soon after,

Cantu said, he and Boettcher left town to go to Arkansas, apparently leaving Mosqueda and Kitchen alive. (33 RR 71–72, 74.)

Counsel may well have decided, and reasonably so, that the story about a rival drug dealer was concocted and unbelievable. Counsel may have decided that the best chance of saving his client's life was to not contest overmuch the murder, but to contest those aspects of the murder that made the case a death-penalty case and to persuade the jurors to spare Cantu's life. (SHCR 159–60; 41 RR 31; 33, 43, 45 46.) To the extent that Cantu alleges that counsel picked the wrong trial strategy, he fails to rebut the presumption that counsel strategy was reasonable. See Strickland, 466 U.S. at 690.

To the extent that Cantu alleges that counsel was ineffective for failing to investigate the case of actual-innocence, where a petitioner alleges that counsel failed to investigated his case, the petitioner must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Lockett, 230 F.3d at 713; see, e.g., Wiggins, 539 U.S. at 516–17 (reviewing proposed mitigating evidence that was not presented). Cantu does not even allege what

additional investigation would have revealed. By so failing, he does not carry his burden. See Strickland, 466 U.S. at 690.

As for Cantu's argument that counsel was ineffective for conceding his guilt before the jurors, as Cantu himself notes, such a concession does not per se constitute deficient performance. See Woodward v. Epps, No. 06-70053, 2009 WL 2569795, at *5–6 (5th Cir. Aug. 21, 2009) (finding no ineffectiveness where "avoiding execution [may have been] the best and only realistic result possible"); Haynes v. Cain, 298 F.3d 375, 380–83 (5th Cir. 2002) (finding no counsel ineffectiveness where counsel in opening argument conceding client's guilt as to second-degree murder to avoid death penalty associated with first-degree murder); United States v. Short, 181 F.3d 620, 624–25 (5th Cir. 1999) (finding no ineffectiveness where counsel in closing implicated client in drug trade in effort to avoid more guilt on more serious charge); see also Florida v. Nixon, 543 U.S. 175, 192 (2004) (determining that counsel's failure to get client's consent to strategy of conceding guilt at guilt-innocence phase of capital trial does not render counsel's performance deficient automatically). And as lead counsel, J. Matthew Goeller, said the defense strategy throughout trial and into sentencing was based on Cantu's lack of future dangerousness,

his drug and alcohol use, his disfunctional family life, and his religious conversion. (SHCR 156–57.) Cantu does not show that conceding guilt in connection with non-capital murder was objectively unreasonable. See Strickland, 466 U.S. at 687–88.

> D.     The court below did not abuse its discretion when it failed to stay and abate proceedings.

Cantu alleges that the district court erred in not staying and abating the federal proceedings to allow him to return to state court to present his ineffective-assistance claim. (Br. at 24–26.)

The district court's refusal to grant a stay in a habeas proceeding is reviewed for abuse of discretion. See McFarland v. Scott, 512 U.S. 849, 858 (1994); Brewer v. Johnson, 139 F.3d 491, 492–93 (5th Cir. 1998). When a federal habeas petitioner files a mixed petition—a petition containing claims that have been presented to state court and claims that have not been presented to state court—the federal court may in some circumstances stay proceedings to allow him to return to state court to present the hitherto unpresented claims. See Rhines v. Weber, 544 U.S. 269, 277 (2005). The federal court should stay and abate proceedings only (1) if the petitioner's failure to seek state relief was due to good cause, (2)

where the claims have merit, and (3) there is no indication that the petitioner was dilatory.  See id. at 278.

1.    Cantu showed no good cause.

Cantu showed no good cause for failing to present the claim to the state court.  In his motion seeking a stay and abeyance, he alleged only that state habeas counsel failed to present the claim.  (Mot. to Stay Pet. and Hold in Abeyance Pending State Ct. Exhaustion at 1; Docket # 21 at 1; R 193–97.)

Although the Supreme Court has not defined "good cause" sufficient to justify a stay and abeyance, see Rhines, 544 U.S. at 277, the Court suggests that if a petitioner acts in good faith, his reasonable confusion about state law may constitute good cause.  See Pace v. DiGuglielmo, 544 U.S. 408, 416–17 (2005).  Other courts have determined that the standard is not met by ignorance of the law, see Josselyn v. Dennehy, 475 F.3d 1, 5 (1st Cir. 2007); the petitioner's belief that his counsel raised the issue on appeal, see Wooten v. Kirkland, 540 F.3d 1019, 1024 (9th Cir. 2008); or counsel's decision not to raise the issues in state court, see Clements v. Maloney, 485 F.3d 158, 170 (1st Cir. 2007); cf. In re Kirkland, 86 F.3d 172, 176 (10th Cir. 1996) (determining that "good cause" sufficient to excuse

lack of service not met by inadvertence, negligence, mistake of counsel, ignorance of the rules); Townsel v. Contra Costa County, Cal., 820 F.2d 319, 320 (9th Cir. 1987) (determining that "good cause" sufficient to excuse service not met by ignorance of the rules).

Cantu's failure to present his claim in state court reflected neither good faith nor reason. Cantu knew before and during trial that his defense was not based on innocence. He knew during state habeas proceedings what the trial strategy had been. He does not show that he made a good faith effort to advance the claim. Nor does he show that the failure to advance the claim arose from a reasonable error or confusion.

One might presume that "good cause" requires more than negligence or an after-the-fact disagreement between the client and counsel about trial or postconviction strategy. But Cantu fails to offer any explanation about his or his state habeas counsel's failure to advance his claim. Indeed, even if the Court assumes that Cantu wished to raise the claim and counsel refused, counsel's decision may have been reasonable. Cantu offers nothing to this Court, and presumably offered nothing to counsel, suggesting that such a claim had merit. Cf. Jones v. Barnes, 463 U.S. 745, 745 (1983) (stating that on appeal, attorney need not argue every

conceivable issue, especially when some issues may be without merit;

attorney has professional duty to choose among the potential issues using

his judgment as to their merits and according to his tactical approach);

Hooks v. Roberts, 480 F.2d 1196, 1198 (5th Cir. 1973) (stating that

appellate counsel not required to consult with his client about the legal

issues to be presented on appeal).

    2.    The claim sought to be advanced was meritless.

Further, as discussed above, the ineffective assistance claim that

Cantu wished to advance in state court had no merit.  See Rhines, 544

U.S. at 278.  The court below did not abuse its discretion in denying

Cantu's motion to stay and abate.  See McFarland, 512 U.S. at 858;

Brewer, 139 F.3d at 492–93.

III.  Even If A Bare Innocence Claim Were Cognizable, Cantu's
     Evidence Does Not Meet The Standard.

Cantu alleges that the court below erred by rejecting his free-

standing innocence claim before allowing factual development.  (Br. at

38–40.)

The lower court did not err.  See Martinez, 255 F.3d at 237.  The

Supreme Court has never recognized as cognizable a free-standing claim

of innocence, see Herrera v. Collins, 506 U.S. 390, 400 (1993), and the court below was bound by such strictures, see 28 U.S.C. § 2254(d). But even if such a claim were recognized, Cantu's situation does not meet the standard. As mentioned above, Cantu confessed to his girlfriend and to his counsel; the murder weapon, bearing his fingerprint and the blood of one of the victim's, was found at the apartment of Cantu's former girlfriend; bloody clothes and ammunition identical to that used in the murders was found in Cantu's apartment; Cantu drove Mosqueda's car after the murders; and Boettcher was wearing Kitchen's ring after the murders. Cantu does not cite exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence suggesting his innocence. See Schlup, 513 U.S. at 324. The district court did not err in rejecting Cantu's stand-alone claim of innocence. See Martinez, 255 F.3d at 237.

## CONCLUSION

The judgment of the court below should be affirmed.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
 for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

_____

*Attorney-In-Charge

THOMAS M. JONES*
Assistant Attorney General
Postconviction Litigation Division

State Bar No. 00784357

P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
Fax No. (512) 936-1280
E-mail: Thomas.Jones@oag.state.tx.us

ATTORNEYS FOR
RESPONDENT-APPELLEE

## CERTIFICATE OF COMPLIANCE

I, Thomas M. Jones, Assistant Attorney General of Texas, certify that this brief complies with the type-volume limitation and contains about 10,222 words.  See Fed. R. App. P. 32(a)(7)(B).

_____
THOMAS M. JONES
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the foregoing brief and an electronic copy on computer diskette were served by mail on the _____ day of October, 2009 to the following address:

Counsel for Cantu
Gena Bunn
Holmes & Moore, P.L.L.C.
110 W. Methvin St.
Longview TX 75601

_____
THOMAS M. JONES
Assistant Attorney General